**HEALTH RESEARCH GROUP and Public Citizen, Plaintiffs,**

v.

**Dr. Donald KENNEDY, Defendant,**

and

**The Proprietary Association, Inc., Defendant-Intervenor.**

**Civ. A. No. 77–0734.**

United States District Court, District of Columbia.

March 13, 1979.

---

William B. Schultz, Washington, D. C., for plaintiffs.

Patricia J. Kenney, Dept. of Justice, Washington, D. C., for defendant Kennedy.

Robert A. Altman, Washington, D. C., for defendant-intervenor Proprietary Association, Inc.

## OPINION

SIRICA, District Judge.

Plaintiffs Health Research Group (HRG) and Public Citizen originally brought this action in April 1977 seeking declaratory and injunctive relief against the Food and Drug Administration (FDA). Their basic claim was that certain aspects of the FDA's system for regulating the over-the-counter (OTC) drug market—those which affirmatively sanction the marketing of Category III [1] OTC drugs—are fundamentally inconsistent with the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301–381 (1976). The original named defendant was Dr. Donald Kennedy, the FDA Commissioner. In July 1977 the Proprietary Association, Inc., a trade association whose members include manufacturers of OTC drugs, was granted leave to intervene as a party defendant.

Plaintiffs soon moved for summary judgment and both defendants filed cross-motions seeking to uphold the affirmative marketing provisions on the merits. The Proprietary Association also argued, in the alternative, that neither plaintiff had standing to bring the action.

---

1. *See* 21 C.F.R. § 330.10(a)(5)(iii) & (a)(12)(i) (1978).

On December 1, 1978, the Court issued a memorandum indicating that neither the complaint, nor any supporting materials filed in the action, adequately established plaintiffs' standing. Plaintiffs were given an opportunity to seek leave to amend the complaint and to file affidavits in support of their standing. *See Warth v. Seldin,* 422 U.S. 490, 501–02, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). *See also* note 11, *infra.* The Court's December memorandum also raised certain questions regarding the ripeness of the controversy for judicial intervention.[2]

Plaintiffs responded to the Court's memorandum by seeking leave to file an amended complaint. Their motion is designed to add three new, individual plaintiffs to the action. The organizational plaintiffs state that the addition of these individuals would make their own standing "immaterial." Alternatively, plaintiffs maintain that they have standing in their own right, relying on several affidavits and documentary exhibits filed in response to the Court's December memorandum.

Following the taking of depositions of the three proposed individual plaintiffs, defendant Proprietary Association responded by: (1) renewing its argument that the *original* plaintiffs have no standing; (2) challenging the motion for leave to amend on grounds of timeliness and prejudice and the lack of both standing and "interest" of the *proposed* plaintiffs; and (3) for the first time, arguing that none of the present or proposed plaintiffs has a claim which is ripe for review. The federal defendant's counsel[3] responded with a motion to dismiss the original complaint on the grounds of lack of

ripeness, failure to exhaust administrative remedies, and lack of standing. Also filed was a cursory opposition, on grounds of lack of timeliness, to plaintiffs' motion for leave to amend their complaint. The federal defendant addressed the question of standing only with regard to the original plaintiffs, noting that if plaintiffs' motion for leave to amend is granted, it "plans to challenge the standing of the three additional plaintiffs by motion and a supplemental memorandum." Federal Defendant's Motion to Dismiss, at 16 n. 8 (filed Jan. 29, 1979).

The parties' responses to the Court's December memorandum have obviously complicated the preliminary issues before the Court. Fortunately, the question of the standing of the present, organizational plaintiffs—the issue which must be addressed at the threshold—has been fully briefed and the inadequacies in the record which previously troubled the Court have been remedied. It is to that issue that the Court first turns.

### I.

An association's standing to seek judicial relief may arise in one of two ways. First, "an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975).[4] Second, whether or not an association suffers injury itself, it "may have standing *solely* as the *representative* of its mem-

---

**2.** The ripeness doctrine, like the doctrine of standing, involves both prudential considerations and Article III limitations on a federal court's jurisdiction. *See, e.g., Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 81–82, 98 S.Ct. 2620, 2635; 57 L.Ed.2d 595, 616–17·(1978).

**3.** Defendant Kennedy had never joined the challenge to the organizational plaintiffs' standing. Curiously, following issuance of the Court's December memorandum, and after first indicating that a response would be made only on the ripeness question, Kennedy's Justice Department counsel reversed her position, re-

quested additional time to submit a brief on the standing issue, and indicated that standing would be argued "on behalf of the client agency" despite the fact that the client had "previously requested the issue not be raised." Federal Defendant's Motion for Enlargement of Time (filed Jan. 12, 1979).

**4.** Even where the injury is to the association itself, the association may, in appropriate circumstances, assert certain legal rights and interests belonging to its members. *See Warth v. Seldin, supra,* 422 U.S. at 511, 95 S.Ct. 2197.

bers." [5] *Id.* (emphasis added) (citing *National Motor Freight Ass'n v. United States,* 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963)).

In the case at bar, plaintiffs Public Citizen and Health Research Group allege no injury to any interest of their own. They seek instead to establish their standing solely in a representational capacity. *See* Complaint, para. 18. Plaintiffs do not, however, seek standing as the representatives of their *members.* Indeed, plaintiffs concede that they have no members, having been intentionally structured as non-membership organizations in order to promote "efficiency." Supplemental Affidavit of Dr. Sidney M. Wolfe (filed Dec. 19, 1978) (hereinafter cited as "Wolfe Affidavit"). Rather, plaintiffs allege injury only to their "contributors" and "supporters." Because plaintiffs do not claim injury to any interest of their own, the question arises whether they may have standing *solely* as the representatives of these contributors and supporters. [6] This question requires the Court to review the origin and purposes of the representational standing doctrine summarized in *Warth* in light of the characteristics of the plaintiff organizations and their allegations of injury.

### A.

Public Citizen, Inc., is a public interest organization organized as a District of Columbia non-profit corporation. Wolfe Affidavit, at 1. Founded in 1971 by Ralph Nader, it serves as an umbrella organization for the financing and operation of various consumer advocacy groups, including plaintiff HRG. Funding is obtained through individual contributions. [7] The organization is run ("headed") by a board of directors appointed by Mr. Nader, who "structured Public Citizen as a non-membership organization in order to promote efficiency and to minimize some of the expense and other burdens which have been experienced by membership organizations." *Id.* at 2. Plaintiffs emphasize, however, that individual supporters and contributors "influence Public Citizen's activities through their financial support and their letter writing." *Id.* at 4. [8]

Public Citizen's official position on particular issues is said to be "determined primarily by its employees." *Id.* at 4. These positions are advocated in frequent appearances in administrative proceedings and litigation in the federal courts.

HRG, in turn, is one of several consumer advocacy groups funded and operated by Public Citizen. Its purpose is "consumer research and advocacy on health issues" and it "has done extensive work on many 'Category III' drugs." Complaint, para. 3. Like Public Citizen, it has no members. Unlike its parent organization, however, HRG has no *direct* contributors, being funded primarily by Public Citizen. [9]

---

**5.** There are three basic requirements for such representational standing. As summarized in *Hunt v. Washington Apple Advertising Comm'n*:

> Thus we have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit.

432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). In *Hunt* the Court referred to an organization's assertion of standing on behalf of its members as "associational standing." *Id.*

**6.** Of course, even assuming that this question may be answered in the affirmative, there are a number of additional requirements for representational standing, the most fundamental of which is that the parties sought to be represented must have standing to sue in their own right. *See* note 5, *supra.*

**7.** Approximately 70,000 individual contributions were received in 1977. The average amount was $15. Wolfe Affidavit, at 1.

**8.** Plaintiffs argue that this influence gives the contributors a "functional vote" in Public Citizen's operation. See Motion to Amend Complaint, at 4 (filed Dec. 19, 1978).

**9.** HRG also obtains some income from publications and "incidental" sources. Wolfe Affidavit, at 2.

The complaint alleges that many of Public Citizen's 65,000 contributors are users of Category III drugs, states that the contributions to Public Citizen fund HRG, and then defines the injury for which plaintiffs seek relief as follows:

> Unless the Court orders defendant to revoke his regulations allowing Category III drugs to be marketed, *plaintiffs' supporters* will be subjected to risk to their health and to risk of economic injury on account of the marketing of Category III drugs which have been found to lack substantial evidence of safety and effectiveness and therefore are not generally recognized as safe and effective.

Complaint, para. 18 (emphasis added).

### B.

The associational standing doctrine represents a very limited exception to the fundamental Article III requirement that the plaintiff before the court "be himself among the injured." *Sierra Club v. Morton,* 405 U.S. 727, 734–35, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). That requirement was succinctly summarized in *Warth v. Seldin:*

> As an aspect of justiciability, the standing question is whether the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant *his* [emphasis in original] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). *The Art III judicial power exists only to redress or otherwise to protect against injury to the complaining party,* even though the court's judgment may benefit others collaterally. *A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered "some threatened or actual injury* resulting from the putatively illegal action . . . "

422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (emphasis added). This interest in the injury of the party actually before the court is also effectuated through the prudential guideline that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to the relief on the legal rights or interests of third parties." *Id.* at 499, 95 S.Ct. at 2205.

Yet, despite this emphasis on the injury and the legal rights of the party actually before the court, the associational standing doctrine allows parties who have themselves suffered no injury to seek judicial relief as "representatives" of their "members." The Article III requirement is neither eliminated nor attenuated in such circumstances, according to the Court in *Warth,* because the association's "members" must be shown to have suffered injury sufficient to give them their own standing to sue. 422 U.S. at 511, 95 S.Ct. 2197. But if the existence of cognizable injury, in and of itself, were sufficient to satisfy the Article III requirement, then any association or, for that matter, any individual, could gain standing simply by presenting the court with the case or controversy of any unrelated third party. Surely, something more is required and must be found in the special relationship between an association and its members.

Until 1977, the Court's associational standing cases, like *Warth,* had without exception simply presupposed an organizational plaintiff with "members." *See, e.g., Warth v. Seldin, supra,* at 511, 95 S.Ct. at 2211 ("an association may have standing solely as the representative of its *members*"); *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972) ("organization whose *members* are injured may represent those *members* in a proceeding for judicial review"); *National Motor Freight Traffic Assoc., Inc. v. United States,* 372 U.S. 246, 247, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963) (associations had standing as "proper representatives of their *members*") (all emphases added). In 1977, the Court, in *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383, was for the first time confronted with an organization's claim to associational standing on behalf of third parties who were, at least formally, not its members. Although unanimously upholding the standing of the organization, the Court elevated the importance of member-

ship in associational standing by basing its holding on a finding that parties whom the organization purported to represent were functionally equivalent to members, and that the organization was in substance indistinguishable from a voluntary membership trade association. *See* 432 U.S. at 344–45, 97 S.Ct. 2434.

*Hunt* involved a claim by the Washington State Apple Advertising Commission, a state agency, that a North Carolina apple marketing regulation unconstitutionally burdened interstate commerce in apples. The Commission asserted standing both in its own right, and as a representative of Washington state apple growers and dealers. In addressing the question of the Commission's representational standing, the Court was faced with the problem that the Commission was a state agency, financed by mandatory assessments on the apple growers and dealers whose interests it advocated, and not a "traditional voluntary membership organization." 432 U.S. at 344–45, 97 S.Ct. 2434.

In holding that the Commission did have standing to bring the action in a representational capacity, the Court relied on three characteristics of the Commission which made it a "representative" of the "growers and dealers who collectively form its constituency." *Id.* First, the statutory purpose and the actual activities of the Commission established that it served "a specialized segment of the State's economic community which is the primary beneficiary of its activities." *Id.* at 344, 97 S.Ct. at 2442. Second, because the apple growers and dealers possessed "all of the indicia of membership in an organization," the Commission "[i]n a very real sense . . . represent[ed] the State's growers and dealers and provid[ed] the means by which they express their collective views and protect their collective interests." *Id.* The indicia of membership were found in the fact that the growers and dealers, and no one else, elected the Commission's members, served on the Commission, and financed its activities. Finally, the Court observed that there was a "financial nexus between the interests of the Commission and its constituents"

which made it possible that the Commission's own interests would be affected by the litigation's outcome. *Id.* at 345, 97 S.Ct. at 2442. These circumstances, the Court concluded, made the Commission indistinguishable from a traditional, *i. e.,* a voluntary membership, trade association.

Although none of the characteristics of the non-membership association in *Hunt* were put forth by the Court as immutable requirements for representational standing of all non-membership organizations, *Hunt* clearly reaffirms that a plaintiff cannot gain standing merely on a showing that its interests and expertise are germane to the interests of any third parties who would have standing in their own right. Moreover, the characteristics of the agency and its relationship with the apple growers and dealers which the Court emphasized in *Hunt* strongly suggest that some very substantial nexus between the organization and the parties it purports to represent will be required where those parties are not actually members. In view of the ultimate Article III requirement that the plaintiff be himself among the injured, this suggestion is quite important.

Members, as the Court implicitly acknowledged in *Hunt,* normally exercise a substantial measure of power or control over an organization which, in typical circumstances, they themselves have created. In *Hunt,* "the indicia of membership" were present because the growers and dealers *alone* elected the members of the Commission, served as members of the Commission, and financed its activities. In a real sense then, despite the anomaly that the Commission was a *state*-created, non-membership organization, it was totally a creature of the parties it purported to represent.

So long as the courts insist on some sort of substantial nexus between the injured party and the organizational plaintiff—a nexus normally to be provided by actual membership or its functional equivalent measured in terms of control—it can reasonably be presumed that, in effect, it *is* the injured party who is himself seeking re-

view. Absent this element of control, there is simply no assurance that the party seeking judicial review represents the injured *party,* and not merely a well-informed point of view. Ultimately, unless an organization truly *represents* an *injured party* its position will not be meaningfully different from that of the environmental organization in *Sierra Club v. Morton* which sought standing as a "representative of the public." 405 U.S. 727, 736, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). And as the Court there held: "A mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to [confer standing]." *Id.* at 739, 92 S.Ct. at 1368.

### C.

Defendants argue that Public Citizen and Health Research Group cannot have standing to represent the interests of their contributors and supporters for two reasons. First, they claim, the persons whom plaintiffs purport to represent do not themselves have standing. Second, they argue that even if these individuals have standing, plaintiffs cannot represent them because they are not members of either plaintiff. The Court need not address the first theory [10] because it finds that, under the principles set out in part B, plaintiffs' contributors and supporters have neither the indicia of membership nor any other connection with plaintiffs sufficiently substantial to confer associational standing on either plaintiff.

Public Citizen has no formal continuing relationship with its thousands of small contributors and its undefined "supporters." Informally, of course, many persons no doubt continue to contribute from year to year and they and others who somehow "support" Public Citizen in less overt ways presumably keep abreast of its activities and express their opinions on its positions. Plaintiffs allege that their supporters and

contributors "influence Public Citizen's activities through their financial support and their letter writing." Wolfe Affidavit, at 4. They also argue that "the members [sic] of Public Citizen have a functional vote and have considerable influence on Public Citizen's policies and projects." Motion to Amend Complaint, at 4 (filed Dec. 19, 1978). Two factors—the individual contributions and the "continual communication" between Public Citizen and its contributors and supporters—are said to provide this influence. According to plaintiffs, Public Citizen differs from more traditional public interest organizations in only "formal" ways: "we do not send out membership cards and our members [sic] do not elect a board of directors." Wolfe Affidavit, at 4.

■ But it is not disputed that the contributors and supporters have absolutely no direct control over either plaintiff. Public Citizen (and in turn HRG) was founded by Ralph Nader and is operated by Mr. Nader, the board of directors *he* appoints, and the employees hired by that board. Having structured Public Citizen and HRG as non-membership organizations for the express purpose of "promoting efficiency" and minimizing the "expense and other burdens" of membership groups, Mr. Nader would hardly be in a position to seriously argue that his contributors or supporters exercise any substantial degree of even indirect control over his organizations.

In the Court's view, there is a material difference of both degree and substance between the control exercised by masses of *contributors* tending to give more or less money to an organization depending on its responsiveness to their interests, or through the expression of opinion in the letters of *supporters,* on the one hand, and the control exercised by *members* of an organization as they regularly elect their governing body, on the other. The Court does not doubt that the plaintiffs have been and would continue to be competent and effective advocates for the abstract interests of drug

---

10. The first contention is closely related to a major issue raised by plaintiffs' motion for leave to amend their complaint by adding three new individual plaintiffs: whether those particular individuals have standing in their individual capacities.

consumers. But such abilities are not sufficient to confer standing. *See Sierra Club v. Morton, supra.*

There is a second, independent reason for denying plaintiffs standing which serves to further illustrate the absence of any substantial nexus between plaintiffs and their contributors and supporters. As noted briefly above, one of the three prerequisites for associational standing of even a traditional membership organization is that "the interests it seeks to protect [be] germane to the organization's purpose." *Hunt v. Washington Apple Advertising Comm'n, supra,* 432 U.S. at 343, 97 S.Ct. at 2441. This requirement helps insure, not only that the party before the Court be a competent and effective advocate on the issues presented, but also that the members of the plaintiff organization have had an opportunity to influence their representatives on positions related to the *particular* member injury at issue. Like the membership requirement discussed above, this too ultimately insures that it is the injured party, and not merely a well-intentioned advocate, who is, at least in effect, before the Court.

Here, the contributors upon whom plaintiffs rely so heavily are contributors only to Public Citizen. Public Citizen's purpose is basically to act as an umbrella organization and conduit for funds to a diverse set of consumer advocacy groups, one of which is HRG. HRG, however, is not alleged to have any contributors. Thus, when a contributor gives a contribution to Public Citizen, he is exercising influence over an organization with the broadest of concerns: the public interest. The interests sought to be protected in this lawsuit have a substantial identity only with the purposes of HRG:

consumer advocacy on health issues. Whatever the relationship of Public Citizen to *its* contributors, therefore, the relationship between those contributors and HRG—the only plaintiff whose purpose is germane to the interests sought to be protected in this lawsuit—is highly attenuated. HRG is merely one of many projects to which Public Citizen's contributions are channeled.

In sum, plaintiffs—who allege no injury to themselves and seek standing solely as representatives of their contributors and supporters—have no members; their contributors and supporters have no indicia of membership or any other substantial nexus with the plaintiff organizations; and the only plaintiff whose purpose is germane to the interests sought to be protected in this lawsuit, HRG, does not itself have any of the contributors who plaintiffs assert exercise a "functional vote" over their affairs. For these reasons, the Court concludes that neither plaintiff has standing.

## II.

Public Citizen and HRG also responded to the Court's December memorandum by seeking leave to amend their complaint [11] to add three individuals as parties plaintiff: Mimi Cutler, Pamela S. Ellsworth, and Stephen D. Annand. All three are alleged to be consumers of OTC drugs. Ms. Cutler, in addition, is said to be a contributor to Public Citizen.

Defendant Proprietary Association challenges the standing of these individuals and the ripeness of their claims. Its challenge involves issues quite similar to those raised by both defendants regarding the standing of the original plaintiffs' contributors and

---

11. The Court wishes to note that it did not invite this particular proposed amendment. Rather, the Court's December memorandum merely followed the Supreme Court's advice in *Warth v. Seldin:* "[I]t is within the trial court's power *to allow or to require the plaintiff to* supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dis-

missed." 422 U.S. 490, 501–02, 95 S.Ct. 2197, 2206, 2207, 45 L.Ed.2d 343 (1975). This Court's citation to note 8 of the *Sierra Club* opinion, *see* December Memorandum, at 2, a passage also dealing with amendment of a complaint to clarify an existing plaintiff's standing, makes this clear.

In their response to the Court's December memorandum, plaintiffs, in addition to submitting materials supporting their own standing, sought to avoid the issue by moving to add new plaintiffs to the action.

supporters. *See* note 10, *supra,* and accompanying text. The Court did not need to consider the standing of the contributors and supporters, itself an essential element of the original plaintiffs' standing, because it found the original plaintiffs lacked standing in any event. *Id.*

With regard to the motion to amend, the Court would have preferred to consider the standing and ripeness questions at the threshold—simply denying plaintiffs leave to amend if none of the proposed plaintiffs had standing or if their claims were not ripe. Unfortunately, the federal defendant has indicated specifically that its papers address only the standing of the original plaintiffs and that a separate motion and memorandum on the standing and ripeness issues will be filed if the motion for leave to amend is granted. Federal Defendant's Motion to Dismiss, at 16 n. 8 (filed Jan. 29, 1979).

The Court will at this time, therefore, address only three narrow questions: whether plaintiffs who themselves have no standing can, in effect, substitute other plaintiffs who may have standing; whether such a result can be accomplished through an amendment to the complaint pursuant to Rule 15 of the Federal Rules of Civil Procedure; and whether, in any event, substitution of the new individuals as plaintiffs is either untimely, unduly prejudicial, or not in the interests of justice.

There are actually three potential procedural devices for the addition of a party plaintiff to an existing lawsuit. The method invoked here was Rule 15, a rule pertaining generally to amended pleadings. The rule provides that leave of court to amend pleadings "shall be freely given when jus-

tice so requires." Fed.R.Civ.P. 15(a). That Rule 15 was intended to be used to add or drop parties from pleadings, at least with respect to parties adverse to the pleader, is made clear by the reference in subsection (c) of Rule 15 to "[a]n amendment changing the party against whom a claim is asserted." Another potential device for adding or dropping a party is Rule 21, titled "misjoinder and non-joinder of parties." That rule states, in part, that "[p]arties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." Finally, a party can be added to an action on its own initiative pursuant to Rule 24. Permissive intervention under that rule may, in the court's discretion, be granted if the application is "timely" and if the "applicant's claim or defense and the main action have a question of law or fact in common." [12] *See* Rule 24(b). In exercising its discretion, the court is to "consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."

As between Rules 15 and 21, there is no practical difference in application or effect, at least in those circumstances where Rule 15 requires leave of court. Both rules invest the court with broad discretion to grant leave to add or drop a party and in both instances the court's decision is guided by the related considerations of timeliness and prejudice to the opposing party. *See* Wright & Miller, 6 *Federal Practice and Procedure* § 1481, at 420 (1971) & 7 *Federal Practice and Procedure* § 1688, at 339–40 (1972). Substitution of one plaintiff for another has been found to be permissible under either rule.[13] *See* 3 *Moore's Federal*

---

12. The purely procedural requirements for intervention are set out in subsection (c) of the rule.

13. Defendant Proprietary Association argues, briefly, that the three individuals named in the proposed amended complaint should have sought to intervene under Rule 24. Although the authorities cited above indicate that there is substantial opinion to the contrary, even assuming that defendant is correct, the Court would not view the error as determinative. All

three individuals have filed affidavits with the Court expressing their desire to become part of the action as parties plaintiff. These affidavits were accompanied by a proposed amended complaint which, in effect, sets forth the claim for which "intervention" is sought. Both the affidavits and the proposed complaint were served upon the other parties, as would be required under Rule 24(c). Moreover, it is clear that these individuals' claims and the claims in the "main action" have questions of law in common since the claims are identical.

# 30

*Practice* § 15.08[5], at 15–115 to 116 (2d ed. 1978) & 3A *Moore's Federal Practice* ¶ 21.-04[1], at 21–26 to 27 (2d ed. 1978).

In the Court's view, the important threshold question is not upon which rule the plaintiffs base their motion, but rather whether one plaintiff, who lacks standing, can substitute another, who has standing, to save the action. The concern is that the Court may have no jurisdiction to entertain the original plaintiff's motion.

Strong support for allowing such a substitution can be found in *Mullaney v. Anderson,* 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458 (1952). *Mullaney* involved Alaska's imposition of a substantially higher license fee on non-resident fishermen than it imposed on its own residents. The standing of the plaintiffs—a fishermen's union and its Secretary-Treasurer—was challenged for the first time before the Supreme Court. The plaintiffs then moved for the Court's leave to add two non-resident members of the union as parties plaintiff. 342 U.S. at 416–17, 72 S.Ct. 428. Without deciding the standing question, the Court allowed the amendment, relying specifically on the broad language of Rule 21. *Id.* at 417, 72 S.Ct. 428. The original plaintiffs had always alleged that they were bringing their action on behalf of the non-resident union members. "To grant the motion," the Court stated, "merely puts the principal, the real party in interest, in the position of his avowed agent." *Id.* And, the Court concluded, earlier addition of the union members would not in any way have "affected the course of the litigation." "To dismiss the present petition and require the new plaintiff to start over in the District Court," the Court said, "would entail needless waste and runs counter to effective judicial administration . . . ." *Id.*

See also *Miller & Miller Auctioneers, Inc. v. G. W. Murphy Industries, Inc.,* 472 F.2d 893, 895–96 (10th Cir. 1973); *Hackner v. Guaranty Trust Co. of New York,* 117 F.2d 95, 98 (2d Cir. 1941).

■ The instant case is strikingly similar. Public Citizen and HRG have, from the outset of this litigation, claimed to represent the interests of OTC drug consumers, in general, and their contributors and supporters, in particular. As in *Mullaney,* the addition of these three OTC drug consumers, two of whom are obviously supporters of plaintiffs and one of whom is alleged to be an actual contributor, merely substitutes the real parties in interest for their now avowed agents. Here too, as a practical matter, if the Court refused leave to amend, these individuals could simply start this action over again at the complaint stage.

The other factors to be considered—timeliness or undue delay and prejudice to defendants—also seem to the Court to favor granting plaintiffs leave to amend. Although there are several new preliminary issues which will be raised by the amendment, most notably those of standing of the particular individuals, the ripeness of their particular claims, and their alleged failure to exhaust administrative remedies, the paramount consideration is that the ultimate claims on the merits, already extensively briefed and argued on cross-motions for summary judgment, remain unchanged. There is simply no substantial prejudice to the defendants stemming from the formal substitution of these drug consumers for the associations which purported to represent them. The Court will therefore exercise its discretion to allow the complaint to be amended to add the three proposed plaintiffs as parties to the action.[14] The

---

*See* Fed.R.Civ.P. 24(b). In these circumstances the Court would not insist on purely technical compliance with the rule, consisting largely of changing the label on the submitted papers. *See* Wright & Miller 7A *Federal Practice and Procedure* § 1914 (1972 & 1977 Supp.). Like motions under Rules 15 and 21, applications pursuant to Rule 24 are addressed to the Court's discretion and involve considerations of

timeliness and prejudice. *See* Fed.R.Civ.P. 24(b).

**14.** Defendant Proprietary Association raises one other point which should be noted at this time, that the "three proposed plaintiffs do not have a real and direct interest in this litigation." Memorandum in Opposition to Plaintiffs' Motion to Amend Complaint, at 15 (filed Jan. 23, 1979). The Association contends that

Court will also grant the federal defendant a brief period in which to file its motion to dismiss.

### III.

Accordingly, the Court will grant plaintiffs' motion to amend the complaint, dismiss the original plaintiffs pursuant to Rule 12(b)(1), for lack of standing, and postpone consideration of the remaining issue until filing of the federal defendant's motion to dismiss the new plaintiffs.

the three would be nominal or sham plaintiffs, essentially because their involvement in the action was solicited by the original plaintiffs' attorney.

The affidavits of these individuals, as well as their deposition testimony, indicate that all three allege injury from the operation of the regulation being challenged in the amended complaint. Each states, in a sworn affidavit, that he or she is willing to become a plaintiff in this action because of his or her support of its goals. In these circumstances, the fact that the three are also motivated by a desire to "assist" the original plaintiffs, or that their attorney is not charging them any fees, is immaterial. *Compare Ellis v. Dyson,* 421 U.S. 426, 434, 95 S.Ct. 1691, 44 L.Ed.2d 274 (1975) (counsel had not communicated with clients for one year and did not know their whereabouts).

The question of whether the three new plaintiffs have suffered injury in fact and will benefit from the requested relief is wholly distinct and will not be addressed at this time.